IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs May 4, 2010

## REGINALD ROME v. STATE OF TENNESSEE

**Direct Appeal from the Criminal Court for Shelby County**
**No. 03-01497    W. Mark Ward, Judge**

———————————

**No. W2009-02027-CCA-R3-PC  - Filed January 12, 2011**

———————————

A Shelby County jury convicted the petitioner of one count of first degree murder and five counts of attempted first degree murder, Class A felonies. He received an effective sentence of life without parole plus 100 years in the Tennessee Department of Correction. A panel of this court affirmed the trial court's judgments. The petitioner filed a petition for post-conviction relief, which the post-conviction court heard and denied. On appeal, the petitioner alleges that he received ineffective assistance of counsel when counsel's failure to include an issue in the motion for new trial resulted in waiver of that issue for purposes of appellate review. Following our review, we affirm the denial of post-conviction relief.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

J.C. MCLIN, J., delivered the opinion of the court, in which ALAN E. GLENN and D. KELLY THOMAS, JR., JJ., joined.

Neil Umsted, Memphis, Tennessee, for the appellant, Reginald Rome.

Robert E. Cooper, Jr., Attorney General and Reporter; Cameron L. Hyder, Assistant Attorney General; and William L. Gibbons, District Attorney General, for the appellee, State of Tennessee.

### OPINION

#### Background

*Trial*

On direct appeal, a panel of this court summarized the underlying facts of this case as follows:

Jessica Selby testified that she was married to Greg Selby, the deceased victim, who was a Shelby County Deputy Sheriff. She said the victim worked the shift from 3:00 p.m. until 11:00 p.m. in December 2002. She recalled that on the day of his death, the victim babysat one of their two children while she was at work and prepared dinner for the family before he left for work.

Detective William Speight testified that he was employed by the Shelby County Sheriff's Office and was assigned to the narcotics division on December 4, 2002. He was part of the team of officers that went to the [petitioner]'s home that evening to execute a search warrant. He said that he had obtained the warrant on December 3 and that a team of twelve officers met on December 4 to plan their execution of it. He said that they went to the [petitioner]'s house about 5:30 or 6:00 p.m. and that it was dark outside. He and the other officers were wearing "raid gear," which included a ballistics vest, a helmet with goggles, and a holster for their guns. He said the gear and their clothing contained markings identifying them as law enforcement officers. The victim was on the entry team meaning he would be the first officer inside the residence.

Detective Speight testified that he did not hear evidence of people inside the house when he first approached it but that there was a porch light on and a light in the living room. He said after the officers had positioned themselves at the [petitioner]'s house, he banged on an iron door at the front entry twice with a heavy metal pick and announced, "Sheriff's office, search warrant." He repeated this procedure a second time. He said he allowed more than enough time for someone to answer the door and that when no one did, he checked the door and found it locked. He and Detective Jones used a pick and ram to pry open the iron door, and Detective Jones forcefully rammed the wooden door and cracked it open four to six inches after one blow. He said he heard a gunshot come from the house, which struck the victim, who was on his way up the porch. He said the victim fell off the porch. He said he ran down the porch and positioned himself behind a window unit air conditioner beside the door and returned fire into the house through a window. He said that he shot into the house in the direction where he thought the shooter was. He said that he knocked the glass out of the window in order to see inside the house and that he could see a person lying on the living room floor. He said that this person was Calvin Williams, who was unarmed. He said that the shots from inside the house stopped but that he heard a detective who was not at the front door firing a shotgun. He said Detective Chambers sent a police dog inside to

get Williams out. He said that they learned from Williams that someone else was inside the house and that the police dog went back inside the house and retrieved the [petitioner]. He said that after the [petitioner] told them no one else was inside the house, he and his partner, Detective Feathers, entered and found a silver revolver in the hallway.

On cross-examination, Detective Speight admitted that he had not received any formal training about executing search warrants when he joined the narcotics division in October 1998. He said he had learned on the job that the law required a "knock and announce" procedure before entering a home. He said he had never been given any formal instruction regarding a specific length of time after knocking and announcing before forcibly entering a home. He said the narcotics team did not attempt to surprise people, but he admitted they used a large number of people to protect the evidence they were attempting to seize and to ensure the safety of the officers. He denied having seen the doorknob missing on the wooden door, any damage to the door, or that the door frame was missing. He acknowledged a "barrage of bullets" and having heard the shotguns being fired but said he did not know how many shots the officers fired at the [petitioner]'s house.

Detective Speight testified that there was not a specific period of time to wait before entering a house after the knock and announce procedure. He said the time varied according to how long it would take an occupant to get to the door based upon the size of the house and any information known about specific dangers that existed at that residence. He said that he had information about the [petitioner] having been in possession of a sawed-off shotgun in the past and that this information played into the decision of how long to wait before attempting to enter the [petitioner]'s house. He said they waited long enough for a person to get from the back of the [petitioner]'s house to the door.

Lieutenant Alvin Moore of the Shelby County Sheriff's Department testified that he was involved in the investigation of the [petitioner]. He said he requested a trace through the federal Alcohol, Tobacco, and Firearms database of a Colt King Cobra .357. He learned through the database information that the weapon had been purchased by Willie Collins. He spoke with Mr. Collins, who was registered in the database as being a California resident, but who had moved to Shelby County.

Calvin Williams testified that he was living temporarily with his brother-in-law, the [petitioner], in December 2002. He said that on December 4 at about 5:30 or 6:00 p.m., he was lying on the living room couch drinking a beer about to go to sleep, having just eaten dinner. He said it was not dark yet. He said that a couple of minutes before the police came, a person named Roderick had come by. He said that the [petitioner] had answered the door for Roderick and that he had been cooking dinner at the time. He described the home as a four-bedroom house. He said the [petitioner] used the master bedroom, which was in the back corner. He said that after dinner while he was on the couch, the [petitioner] was in his bedroom. He said that the living room television was turned on and that he thought the [petitioner]'s bedroom television was turned on, as well.

Mr. Williams testified that he heard some noise and thought that Roderick had returned and was "playing on the door." He said he heard the door coming open, a "boom," and hollering "Police, sheriff, put your hands up, don't move." He also heard them say, "Search warrant." He said, "I didn't know what he was talking about because the house had just been previously burglarized." He said he was scared because he did not know whether the person who committed a burglary the day before had returned. He also said he was not paying attention to what they were saying because he was trying to see what they were pointing at him. He said that he lay on the floor and saw the [petitioner] come down the hall with his gun. He said he could see that the people outside were police officers and could see a gun pointed at him. He yelled at the [petitioner] that the police were there and not to shoot because they were aiming a gun at him. He said the [petitioner] reached around a corner and shot. He said the first shots were fired from the hallway inside the house and then shots came from outside, "[a]ll over the house."

Mr. Williams testified that he did not open the door before the shooting started because it was already opening. He could not say whether there was banging on the metal door before that because he was not paying attention and was "nodding out." He later said he heard a loud noise that he could not identify but that it was not a knock. He said that it was chaotic and that he could see the police entering the house.

Mr. Williams testified that he and the [petitioner] had been away from home the previous day and that when they returned, the front door had been kicked in, the house ransacked, and household items stolen. He said there was an iron door with a glass insert and a wooden door at the front entrance. He

-4-

described the iron and wood doors as "cracked open" and the wood door as "kicked off the hinges almost." He said the items taken included televisions, vacuum cleaners, and VCRs. He said they called the police that morning to report the burglary. He admitted that he had told the police that there was also some marijuana stolen from the house and that the [petitioner] had been selling marijuana after being laid off from a welding job. He said that after the December 3 break-in, they locked the storm door and put a latch on the wood until the doorknob could be fixed.

Mr. Williams testified that he did not know whether there was marijuana or cocaine in the house on December 4. He said he knew there was a glass cooking tube that was used for cocaine in a storage area.

Willie Collins testified that he had lived in Bartlett for about twelve years and had lived in California before that. He said he owned a .357 Magnum Colt King Cobra which he discovered missing in December 2002 when he searched for it after receiving a call from the police. He said he later learned that his son, Brandon Collins, had taken the gun.

Brandon Collins testified that he had taken a gun from his father's house in the summer of 2002. He said he took it to his mother's house, which was three streets away from the [petitioner]'s street. He said that he did not tell either of his parents that he had taken the gun and that he gave it to Jonathan Upchurch.

Jonathan Upchurch testified that he lived one street from the [petitioner]'s street in 2002. He said his friend Brandon Collins gave him a gun, which he sold to "a guy named Rome." He identified the gun as one of the courtroom exhibits and the purchaser as the [petitioner]. He said he did not know the [petitioner] before selling him the gun and had heard through his uncle that the [petitioner] was looking for a gun. He said that he and his uncle went to the [petitioner]'s house and that he sold the [petitioner] the gun for eighty dollars. He said the sale was about five months before the crime on trial took place.

Phil Drewery testified that he was a retired Shelby County Sheriff's Department lieutenant. He said that he was a detective in December 2002 and that he investigated the crime scene. He said he made drawings and photographs of the scene and collected evidence. He said that two separate investigations were made of the scene relative to the homicide and narcotics

and that his involvement was with the homicide investigation. He said that there were numerous bullet holes throughout the house and that he determined that the holes corresponded with fifteen forty-caliber bullets and three rounds of double aught buckshot having been fired. He said a revolver was on the hallway floor. He said that ammunition was in the closet of the master bedroom, including a box of CCI .357 Magnum live rounds with seven rounds missing and a box of Blazer CCI .357 Magnum live rounds with twenty-four rounds missing. He said that in one of the bedrooms, there was a trail of blood droplets leading into the bedroom, to the window, and back to the hallway. He said there were holes and blood stains on the curtains in this bedroom. He said the window in that room faced the front yard. He said there was evidence of a shotgun round having been fired in through this window. He said that bullet holes in the front door indicated that a projectile had gone through the door and into and out of a wall onto the porch area while the door was "wide open" and that another one had been fired while the door was closed. He said that at least three rounds were fired from inside the home through the front door. He described the scene as a video of it was played for the jury. He said that from the outside of the house, he recovered eleven Winchester forty caliber spent shell casings and three spent and one live Winchester twelve gauge double aught shotgun shells. He said this ammunition was consistent with that used by the Sheriff's Department. He said that due to the height of the grass, the condition of the ground, and the traffic of officers and emergency personnel in the yard, it was possible that not all the ammunition was recovered from the yard. He said he was able to account for about twenty-one rounds fired on the scene. He said there were some shell casings on the front porch but that most of them were down the driveway from the porch to the street. He was not able to determine whether shots had been fired out the front window, but he did determine that shots were fired in through the window. He used a diagram to describe specific locations where the ammunition and other evidence was recovered outside the house. He said that the photographs of the iron door showed damage to a deadbolt lock and a missing doorknob on the outside with the doorknob intact on the inside. He said the locking mechanism was missing from the wood door. He said that based upon the position of the doors when he was at the scene, the doors must have been open at some point during the shooting based upon the positioning of bullet holes in the wood door and the fact that the glass was intact in the iron door. He said the door had been forced open at some point before his inspection of the scene because there was damage to the door frame and wall. He said he did not see any marks on the wood door that were consistent with having been struck with a ram.

Officer Samuel Jones of the Shelby County Sheriff's Department testified that he was assigned to the narcotics division in December 2002. He said he was the "ram man" on the search warrant team that went to the [petitioner]'s house. He was wearing apparel with Sheriff's Department markings as well as body armor, under armor, raid vest, helmet, and goggles. He said that he went to the front of the house with Detectives Speight and Selby and that Speight "knocked and announced" by hitting the iron door with the pick and that he "announced," as well. He said Speight was "beating on the door" loudly and that other officers were yelling, "Sheriff's office-sheriff's office." He said that after a "reasonable amount of time," Speight stuck a pick into the seam of the iron door and that he hit the pick twice with the ram. He said they were able to open that door. He said that he hit the wood door with the ram and that it opened about half way. He did not see a chain on the door. He identified a place on the doorknob where he had struck the wooden door with the ram. He said he stepped aside for Detective Selby, who was holding a shotgun, to go inside. He heard a gunshot and saw Selby start to fall back. He said the door opened and the gunshot was "[m]aybe a second" or "a couple of seconds" later. He said that he shot inside the house and that he could see a chrome pistol but not the person holding it inside the house. He heard someone say, "Get George-Get George," referring to Selby. He said he fell off the porch as he tried to drag Selby to safety.

Officer Jones testified that it was dark when they arrived at the [petitioner]'s house. He said there was a car in the driveway. He did not recall whether lights were illuminated. He said the narcotics division's policy was that once forced entry was begun, they would continue even if they heard someone coming to the door.

Brad Taylor testified that he was a nurse on duty at Regional Medical Center of Memphis when the victim arrived on December 4, 2002. He said that in the course of treatment, which included removing clothing, he found a bullet in between the victim's skin and his vest, which was placed in a cup and labeled with the victim's identifying information and given to the liaison officer, Norman Benjamin.

Officer Norman Benjamin of the Memphis Police Department testified that he was assigned to Regional Medical Center on December 4, 2002. He said that he went to the emergency room when he heard an injured officer was being transported and that he stood outside the treatment room door to prevent other officers from going inside. He said Nurse Taylor gave him a bullet in a

clear container that had been collected as evidence. He gave the evidence to Detectives Roberts and Galloway, who were arriving as he received it from Nurse Taylor.

Detective B.G. Roberts of the Shelby County Sheriff's Department testified that he and Detective Denford Galloway went to the hospital on December 4, 2002, to investigate the homicide of Detective Selby. He said that they received the bullet and Selby's clothing and that Detective Galloway initialed the cup which held the bullet. He identified the cup and bullet in evidence as the same ones he received that night. He said he brought the evidence to his office and turned it over to Sergeant White.

Roger Carpenter testified that he was a former reserve officer of the Shelby County Sheriff's Department and was on the narcotics team on December 4, 2002, when they went to the [petitioner]'s house to execute a search warrant. He was assigned to watch the carport door to make sure no one used it to escape from the house. He said he was making his way to the carport when he encountered a dog. He heard deputies yelling "Sheriff's Department Narcotics-Sheriff's Department Narcotics," and he heard banging on a door. He heard three gunshots and someone saying, "Purple down," which referred to an officer being shot. He heard people shouting to get Detective Selby to safety and saw officers shooting into the front door. He heard someone say, "Shoot the window out," but could not see a target inside the window. He said a loud gunshot went off behind him and the window broke. He returned to the carport to stay out of the line of fire. After the gunfire stopped, he went inside and "cleared" the house.

Mr. Carpenter testified that he received instruction at the training academy on "how to clear and search a house." He said this information was not specific to search warrant execution. He said the operations plan in the present case included getting all the officers into place secretively before alerting any occupants of the house to their presence. He said they parked down the street and attempted to get into position, although he was not sure they had been successful in executing the plan. He said the only officer he specifically recalled having seen shooting was Detective Feathers, whom he said was shooting a shotgun at the window while standing in front of the door.

Officer Chauncy Walton of the Shelby County Sheriff's Department testified that he was presently employed by the department and had been a reserve officer with the narcotics unit in December 2002. He participated in

the search warrant briefing and execution at the [petitioner]'s house. He was assigned to cover the carport door and back of the house along with Roger Carpenter and George Stauffer. He wore his raid vest with departmental insignia on it. He said there were twelve officers, a police dog, and four police vehicles on the scene to execute the warrant. He was making his way to his assigned position when a Rottweiler dog who was not restrained and was barking at the officers came out of the carport. He said that he focused on the dog and that as he got closer to Officers Carpenter and Stauffer, the dog turned and ran to the back of the house. He said he was still in the driveway and heard the "knocking and announcing" and "a loud boom." He said that he first heard knocking and announcing as he was closing the doors to the van and that he heard the boom around the time the dog was running away. He said the amount of time that elapsed was adequate for someone to answer the door given the size of the house. He said he heard someone say, "He's got a gun. Get some cover," and he heard officers returning fire. He said that he checked the back of the house and determined that there was no way for someone to escape and then took cover in the carport. He said that he heard more gunfire but that he did not shoot his weapon. He said they sent the police dog inside the house to retrieve the occupants. He attempted to call for help for Detective Selby but had poor radio reception.

Officer Walton testified that he had received academy training regarding building searches. He said he had received on-the-job training that was specific to execution of search warrants.

Officer George Stauffer of the Shelby County Sheriff's Department testified that he participated in executing the search warrant at the [petitioner]'s house on December 4, 2002. He had been assigned to open and close the side doors of the police van and to watch the carport door in the operations briefing, and he had been told the [petitioner] had a gun conviction. He said that it was dark outside when they arrived but that the street lights were illuminated. He said lights were also on inside the house. He said he could hear officers banging on the iron door and announcing, "Sheriff's Narcotics," repeatedly as he closed the van doors. He started toward the carport but stopped when a barking and growling Rottweiler came toward him. He said that he may have yelled at the dog and that the dog ran away. He went to the far corner of the porch by the carport and heard one of the officers say, "Let's do this." He said the other officers on the porch used the ram and pick to open the iron door. He heard a boom, which he identified as the ram hitting the wood door. He heard another boom "seconds later" and saw Officer Selby

fall backwards. He said, "[a] lot of shots started." He ran around the house to make sure no one was coming out the back windows and then returned to the front.

Officer Stauffer testified that he had known the victim since high school and that he brought him blankets from the [petitioner]'s house after it was cleared. He said the victim said that he could not feel his legs, that he was cold, and that he was going to die. He said the victim asked what he was going to do about his girls. He rode to the hospital in an ambulance with the victim. He said the emergency personnel opened the victim's vest in order to cut off his shirt to attach medical equipment.

Officer Stauffer testified that he could not say exactly how much time elapsed from the time he first heard the other officers knocking and announcing and when they used the pick and ram, but he said, "[I]t seemed like forever." He said he had time to leave the van door, go across the yard, deal with the dog, warn the others about the dog, check the carport, and come out of the carport and get into position.

Officer Stauffer testified that he received hands-on training when first assigned to the narcotics division in 1997 by being paired with an experienced officer. He said they sometimes practiced by staging mock search warrant executions at abandoned houses. He said it was not atypical for the knock and announce to begin before all officers were in position.

Captain Phillip Barnett of the Shelby County Sheriff's Department testified that he was on the narcotics team on December 4, 2002, and participated in executing the search warrant at the [petitioner]'s house. He was in charge of the evening shift that night. He said Detective Speight, as the case officer, prepared an operations plan which was approved by Sergeant Nelson. Captain Barnett was on the scene to supervise the officers. He wore marked clothing and a bullet-proof vest under his clothing but not the outer vest worn by the other officers. He said they parked out of view, which was important for officer safety. He said that according to the operations plan, the victim was designated as the first person who would go inside the house. He saw the officers go straight to the house from the van and get into position. From his position on the street, he heard Speight knocking and saying, "Sheriff's Office Narcotics." He said the officers waited long enough for someone inside the house to answer the door. He heard the sounds of the officers forcing the door open and a shot. He turned and saw Detective Selby fall back from where he

-10-

was standing on the front porch. He ran to assist Selby as other officers returned fire. He said that as he was trying to pull Selby to safety, he fell in front of the front window. He said that when he first reached to grab Selby, he heard gunfire and thought he "felt the pressure of the bullet, and heard the sound coming right past my head" from the window area. He heard someone say the shooter was in the window. Officer Hubbard came and helped him move Selby to the west side of the yard. Sergeant Nelson came to help with Selby. Captain Barnett said that he told Nelson to remove Selby's vest to see the location of the entry wound and that he went back to the corner of the house. He could see a person lying on the living room floor inside the house. They decided to send the police dog inside. The dog brought the person out and then returned to the house and brought out the [petitioner]. He said that after the police dog was taken from the scene by an officer, he approached the [petitioner], who said he had been shot.

Captain Barnett testified that when the dog brought the [petitioner] out of the house, Officer Chambers got the dog promptly. He denied that the [petitioner] and Calvin Williams were taken out of the police cars later in order for the dog to attack them. He said that if this had been attempted, he would have stopped it.

Captain Barnett testified that the amount of time before beginning forced entry varied in search warrant execution and that the officers waited a reasonable time based upon the circumstances of the case. He said that ideally, someone would answer the door and allow them to come inside. He said, however, that factors which might affect the amount of wait time included the size of the house and whether they have information that weapons are involved. He said that the situation is safer for the officers and citizens if forced entry were not used. He said there would be a danger in waiting too long to force entry because someone inside the home may destroy evidence or get a weapon.

Robert Rivera testified that he was a reserve officer with the Shelby County Sheriff's Department on December 4, 2002, and that he was part of the entry team executing the search warrant at the [petitioner]'s house. He said that when the entry team reached the front porch, Detective Speight knocked loudly on the door with the pick. He said Detectives Speight and Jones announced "Sheriff's Department" repeatedly. He said there were several knocks and numerous announcements. When they received no response, the pick was used to open the iron door, followed by the ram being used to open the wood door.

-11-

He said that right after Detective Jones opened the wood door with the ram, shots were fired from inside the house. He said Detective Selby was hit by the first bullet and "went backwards." He said he saw someone with a gun behind a wall and returned fire. He did not recall whether the person had a shotgun or a handgun. He identified the [petitioner] as the person with the gun. He said that as other officers removed Selby from the porch, he covered for them to try to keep them from being shot.

Mr. Rivera testified that he did not recall how many times the door was rammed before it opened. He said that typically, the officer with the ram tried to hit the doorknob with the ram. He said the door was wide open after the ram was used but he did not see anyone lying on the floor. He denied any knowledge of the police dog being allowed to attack the [petitioner] and Calvin Williams while they were handcuffed.

Lieutenant Richard Nelson of the Shelby County Sheriff's Department narcotics division testified that on December 4, 2002, he was the sergeant assigned to review the operations plan for the execution of the search warrant at the [petitioner]'s house. He went to the scene and stood to the side with Lieutenant Barnett. He was assigned to secure the rear of the house. He said he did not recall hearing the knock at the door, which he said he would not have been able to hear from where he was, but he said he did hear "Sheriff's Department Narcotics-Sheriff's Department Narcotics." He said there was a shot and "a short body of gunfire." He said he was familiar with the sound of the officers' weapons and recognized the sound of the first shot as being different from that made by weapons issued by the Sheriff's Department. He ran to the back corner of the house to make sure no one was escaping from inside then went to attend the victim. He said the victim was complaining of difficulty breathing. He had another officer retrieve a first aid kit. He said he cut the victim's shirt open and found a bullet hole under the victim's right nipple. He plugged the hole with a bandage and monitored the victim's pulse. He said the victim asked to see his children and asked Lieutenant Nelson to keep him alive.

Detective Dirk Beasley of the Shelby County Sheriff's Department testified that on December 4, 2002, he was on the first shift search warrant team of the narcotics division and was called to work during the evening shift. He responded to the [petitioner]'s house and was assigned to do the narcotics investigation after the homicide investigation was completed. He was sent home until the homicide investigation was completed and returned the

following day to conduct the narcotics investigation. At that point, he executed the search warrant inside the house. He said that in the living area of the house, the search team found identification and paperwork belonging to the [petitioner], four sets of hand scales of the type commonly used by marijuana dealers, a gallon bag with residue inside that smelled like marijuana, a bowl containing marijuana "roaches," a razor blade with residue which field tested positive to be cocaine, a pack of 1.5 rolling papers, and a prescription bottle bearing the [petitioner]'s name and containing a plastic bag with what appeared to be a drug cutting agent inside. He said they recovered from a car in the driveway that was registered to the [petitioner]'s wife a small set of scales, a razor blade, a set of digital scales, and white powder that field tested positive to be cocaine. He said that from a storage area, they recovered two glass crack cooking tubes containing residue that field tested positive to be cocaine, two bottles of substances commonly used to "cut" cocaine, paper that was cut and folded in a manner commonly used to hold drugs in powder form, and a box for digital scales which was of the same brand of scales as those found in the car. In the attic of the house, they found an empty, operating refrigerator. He said it was not unusual for drugs to be kept inside a refrigerator to keep out rodents. He said it was unusual that this refrigerator was plugged in and running because the attic was not a walk-up type attic and required a person to push aside a board and stand on a chair to get into the attic.

Diana Parmenter of the Tennessee Bureau of Investigation testified as an expert witness in forensic chemistry. She tested the items submitted from the search warrant. She said that the powder inside the prescription bottle did not contain any controlled substances but that one of the glass tubes contained cocaine and the substance from the plastic bag was marijuana. She did not test the residue in the second glass tube.

Sergeant Brock Owens of the Memphis Police Department testified that he was assigned to uniform patrol on December 3, 2002, and that he responded to a call at the [petitioner]'s house around 8:00 or 8:30 a.m. He said that the [petitioner] and a friend were present and that the [petitioner] filed a burglary complaint and reported two RCA Zenith televisions and a Sony camcorder as missing. He said he saw no sign of forced entry into the house. He said that he went to the front door when he arrived and that he did not see any damage, although he later conceded he could not be sure the wood door's lock was intact. He said the molding around the door was intact. He said that when he knocked on the door he waited an "average amount of time" and that someone

answered the door. He said the house had not been ransacked, although it was typical that a house would be ransacked in a burglary. He said he walked through the house and went into the bedroom from which the items had been taken. He said he thought he saw a television in the living room but was not positive. He said he did not see any evidence which warranted having the crime scene unit process the scene. He said that he saw some items in the house that he would not have expected to see after a burglary and that he was suspicious whether a burglary had occurred based upon those items and the condition of the house.

Officer Darren Feathers of the Shelby County Sheriff's Department testified that he was on the narcotics division search warrant team on December 4, 2002, and was involved in executing the search warrant at the [petitioner]'s house. He attended the briefing conducted by Detective Speight and was assigned to be a "shotgun man," as was Detective Selby. He said Selby was to be the first officer in the house and he was to be the second. He said he was wearing his raid gear that night. He said that the goal in beginning the execution process was to enter the scene without alerting anyone of the police presence and then letting them know the police were there when the police were ready. He said that Detective Speight knocked on the door and announced, "Sheriff's Office, Narcotics," and that Speight repeated this process a second time. He said they waited a "reasonable" amount of time, that being enough time for someone within the house to come to the door, and then Speight placed the pick in the door and Detective Jones hit it. He said that while Speight and Jones were opening the door, the announcing continued. He said that Jones hit the doorknob of the wood door with the ram and that as the door opened, a gunshot came from inside the house and Selby fell to the ground. He said he shot into the house to give the other officers cover to move the victim. He felt his arm go back but looked and did not see blood or his shirt torn and reloaded his shotgun. He said he was later treated for a grazing wound. He said Lieutenant Barnett and Detective Hubbard moved the victim to the side of the house. He said that as Barnett, Hubbard, and the victim reached a front window, Hubbard looked at him and at the window and that Feathers shot through the window because he thought there was a threat inside. He said there was another window beyond that window at which he did not shoot because he did not believe there was a threat. He said the police dog removed the [petitioner] and another person from the house.

Detective Feathers testified that he did not see any damage to the wood door before Jones struck it with the ram. He said he did not know whether the

-14-

door's lock was in place before it was forced open. He said that just before Selby was shot, Selby was standing at the door with a shotgun on his shoulder pointed at the door.

Sergeant Reginald Hubbard of the Shelby County Sheriff's Department testified that he was a detective in the narcotics division in December 2002 and participated in the search warrant execution at the [petitioner]'s house. He said he was the van driver and was on the entry team. He said he was supposed to get in line with other officers on the entry team after securing the van. He was going across the yard when he heard the knock and announce process. He said he heard knocking three or four times. He said when he came across the yard, he saw one of the officers holding the iron door and saw Jones ramming the wood door. He said that as Jones hit the door, a shot hit Selby, who fell back. He went to aid the victim and drew his weapon and fired into the house in the direction of gunshots he heard inside. He said that the door was open wide and that he did not see anyone lying on the living room floor. He helped pull the victim to the side of the house. He said that as he reached a window, he could see the curtains moving. He fired at the window and yelled, "Cover the window."

Sergeant Hubbard testified that the victim asked him for help and indicated his chest was hurting. He retrieved a first aid kit from Sergeant Nelson's car and called for help on his radio.

Officer Scott Chambers of the Shelby County Sheriff's Department testified that he was assigned to the dog squad and had a dog named Rex who did both apprehension and narcotics duties. He said the dog scratched and barked when he detected drugs and did "bite work," such as apprehending a subject from a house. He said Rex responded to his verbal commands but not the commands of others. He and Rex were at the [petitioner]'s house the night the search warrant was executed. He stood in the yard and watched the entry team. He saw them line up. He said they began saying, "Search Warrant, Sheriff's Office" before they reached the house and then approached the door, knocked, and announced. He heard someone say, "Pick." He saw light coming from between the wood door and the house, shots come out the front door, and Detective Selby fall. He said he squatted down and told Selby to stay down. He said Selby asked him to come help but that he could not. He said that another officer reached Selby and attempted to move away and that he moved toward the door to try to help suppress the gunfire coming at the officers. He said someone shot out a window, sending glass in his direction. He said someone

-15-

was shooting from inside the house because the glass and curtains or blinds flew outside. He yelled for someone to shoot at the window. He said that he saw Sergeant Barnett making unsuccessful attempts to call for help on two radios and that he went to his truck, called for help on his radio, and returned to the front door with Rex.

Officer Chambers testified that before he had gone to his truck, the officers were yelling for the occupants of the house to come outside and were identifying themselves as the Sheriff's office. He said that when he returned with Rex, the officers were still trying to get the occupants to come outside and that he gave Rex a command, "Stella," which meant to go inside and find the threat. He said Rex could physically drag a person across a room. He heard someone screaming and called for Rex to come out. Rex returned with a person. He said he "[i]mmediately took the dog off" and sent him back inside. He heard a commotion, screaming, and bumping from inside the house. He yelled for the person to come outside, and the person said for him to get the dog off him. He said that the person would not come out on his own and that he called for Rex to come out. He said that Rex brought the [petitioner] out and that he separated the dog from the [petitioner] immediately. He sent Rex inside the house a third time, but Rex did not find anyone else. He said that he put Rex into his truck and that the officers checked the house to make sure there was no one else inside. He said he did not get Rex out of the truck again.

Officer Chambers testified that Rex would bite a person to get hold of him and would drag the person out of the house. He said Rex was trained to hold on to the person until he gave the dog the command to release the person. He said, however, that Rex would not continuously bite and attack a person while removing him from a house. He denied having ordered Rex to attack the [petitioner] after the [petitioner] was outside.

Rachel Copeland testified that she was a nurse practitioner and that she obtained a blood sample from the [petitioner]. She took the sample to the Tennessee Bureau of Investigation.

Sergeant Scott Wright of the Shelby County Sheriff's Department testified that he was assigned to the detective division in December 2002. He received a call around 6:30 p.m. about an officer having been shot at the [petitioner]'s house. He went to the scene and learned that Selby and the two occupants of the house had been taken to the hospital for treatment. While still on the scene, he learned that Selby had died. He was the case officer for the

homicide investigation, meaning he directed other officers in performing the various investigative tasks. He said that they recovered a gun containing six empty shell casings in the hallway of the [petitioner]'s house and that there were blood droplets on the floor of a bedroom. He learned that one of the officers had gone into the home and taken some blankets and sheets for Selby before the investigation took place. He learned that the [petitioner] had received medical treatment for a gunshot wound to the left hand and dog bites. He said that he received information that the bullet was still in the [petitioner]'s hand and sent word to the jail that if the [petitioner] had the bullet removed, he would like to receive it, and that he did not ever receive it.

Sergeant Wright testified that Calvin Williams was interviewed but was not charged in connection with the events of December 4. He said that he took two statements from Williams on December 6 and that Williams did not have any serious injuries, although he had some marks from dog bites.

Colonious Davis testified that he was the medical records manager with Regional Medical Center. He identified the medical records for the [petitioner]'s December 4 treatment.

Chad Johnson of the Tennessee Bureau of Investigation testified as an expert witness in DNA. He examined curtains that were submitted for testing and determined that some of them had human blood on them. He later compared a blood standard identified as coming from the [petitioner] with the substance on curtains that were submitted and obtained a "100 percent match." He said that statistically, the odds that the blood on the curtains came from someone other than the [petitioner] exceeded the earth's population.

Don Carmen of the Tennessee Bureau of Investigation testified as an expert witness in forensic firearms identification. He examined the Colt King Cobra .357 magnum revolver that was recovered from the [petitioner]'s house and the bullet that was recovered at the hospital from the victim's clothing and determined that the bullet had been fired from the gun. He also determined that the shell casings recovered from the gun were of the same type, manufacturer, and caliber as unfired cartridges recovered from the master bedroom closet at the [petitioner]'s house. He examined the curtains submitted and determined that there was gunshot residue on them. He said that a particular grouping of holes was indicative of a shotgun blast. He said he was not able to determine in which direction ammunition had traveled through the curtains.

Cerdinia Braswell of the Tennessee Bureau of Investigation and formerly of the Shelby County Medical Examiner's office testified as an expert witness in blood spatter analysis. In her previous employment with the medical examiner, she examined evidence at the [petitioner]'s house. She examined blood spatters in a bedroom, blood drips in the hallway, and blood drops on the curtains in a second bedroom. She said the blood on the bottom of the curtains indicated that blood had fallen from above onto the curtains. She said that it appeared someone had stood in contact with the curtains for some time with the blood dripping down and that the pattern was consistent with someone being shot in the left hand, coming into contact with the curtain, and dripping blood from the wound onto the curtain. She said the blood spatter evidence was consistent with impact from a gunshot wound. She said there was evidence in the hall of a castoff pattern, which was consistent with someone bleeding and moving down the hall. She said there was also evidence of a transfer pattern on a doorknob, indicating that something covered with blood had touched the doorknob, and consistent with the pattern a bloody hand would make. She said there was a blood trail down the hallway, to the bedroom window, and back out of the room.

Doctor O'Brian Cleary Smith testified as an expert witness in forensic pathology. As part of his duties as medical examiner, he examined the scene with two additional members of his staff. He also performed the autopsy of the victim and examined the victim's clothing. He said the victim died of a gunshot wound to the chest. He said the fatal bullet struck the front of the victim's armpit area, grazed his upper arm, went between the third and fourth ribs, severed the artery and the vein underneath the third rib, entered the right lung, caused extensive bruising of the heart, entered the spine at the sixth vertebra fragmenting bone and crushing the spinal cord, and exited the body. He said the victim had external abrasions where the bullet had bounced off the body armor and hit the skin. He said the findings relative to the victim's clothing, including the body armor, correlated with the autopsy findings. He said that based upon the appearance of the entrance wound, it was his opinion that the bullet may have passed through an intermediate target before striking the victim.

Linda Simmons testified for the [petitioner] that she lived next door to the [petitioner] in December 2002. She recalled that on the date in question, she was standing at her front door and saw two or three unmarked trucks come to the area at around 6:00 p.m. and that three men in dark clothes got out of the trucks and went around the house. She said she did not know whether the men

-18-

were police officers. She said she walked to a bedroom after closing her front door and that she heard a screech that sounded like someone was trying to open the [petitioner]'s metal door. She said she heard a shot and then more shooting. She denied having heard the men say anything before the screech and the shooting began. She said that she thought it was a driveby shooting, that she took cover with her family, and that she told her daughter to call 9-1-1. She said that about three or four minutes after the gunfire, she looked out a window and saw an officer bringing "Calvin" out of the [petitioner]'s house. She said that she saw someone taking photographs or filming outside that night and that a day or two later, a police officer came to her house and asked if she knew who had been taking photographs or video. She said the police went around the neighborhood asking what anyone had seen.

Ms. Simmons testified that she suspected Calvin had stolen her dog. She also said she was suspicious that Calvin had arranged the burglary of the [petitioner]'s house on December 3, 2002.

Robert Johnson testified that he was a friend of the [petitioner] and had been a co-worker of his at Diamond Steel. He said the [petitioner] was a welder and had been laid off shortly before the crime. He said they were frequently laid off by their employer. He visited the [petitioner]'s home the evening before the crime and had seen that the front door had been "broken into." He said both the iron door and the wood door had been damaged and that the locks would not engage. He said they were not secure. He said a portion of the door knob of the wood door had been ripped off the handle and was no longer present. He said the [petitioner] was going to work on getting the iron door fixed or replaced the next day.

Jonathan Bozart testified that he lived on the [petitioner]'s street and that he had been at home on December 4, 2002. He said he saw a white SUV pull up and four or six men dressed in black get out and go to the [petitioner]'s house. He denied seeing any writing on the back of their vests. He said he was in the carport. He said that the men had "semi weapons," which he said were long guns rather than handguns. He saw them go to the [petitioner]'s door and thought they were going to break into the house. He said that he saw them get past the iron door and that he could see light through a crack in the wood door but that shots were fired before they got in through the wood door. He said there was a shot fired from inside the house and then more shots, with a total of fifteen to thirty shots. He saw one of the men on the front porch fall and some of the other men drag the fallen person away. He said he heard

screaming and someone yelling, "I give up," and saw the dog bring people out of the house individually. He said that the officer who handled the dog was standing by the front door when the dog brought the [petitioner] out and that the officer stomped the [petitioner] on the head a couple of times and told the dog to "get him." He said that the [petitioner] was later handcuffed and placed face down in the yard and that the officers allowed the dog to attack him for about five minutes. He said an officer came to his house and told him to go inside. He said that the [petitioner] was put in a car and that he later saw a Memphis Police car pull up and an officer get out, pull the [petitioner] out of the car, and hit the [petitioner] a couple of times as other officers watched.

Mr. Bozart testified that when he saw the officer stomping the [petitioner] as the dog brought the [petitioner] out of the house, he retrieved a camera and took pictures, which he said did not develop properly. He said officers came to talk to him two days later and inquired what had happened and whether he had a camera. He said he told the officers that "the lawyer already had the camera." He identified "the lawyer" as one of the [petitioner]'s attorneys.

Mr. Bozart testified that he had been alone outside for about thirty minutes before the police arrived. He denied having seen anyone knock on the [petitioner]'s door shortly before the police arrived. He said the men did not start yelling that they were police officers until after the shooting started. He acknowledged that he did not call 9-1-1 despite the fact he first thought the men were robbers.

Darnisha Simmons testified that she lived next door to the [petitioner] in December 2002. She said that on the night in question, she was in her room watching television and saw a van park outside. She said it was there about ten minutes and that she heard "creeping noises" of people walking. She looked outside and saw "[p]eople in black spread out in the yard with guns." She said she assumed the people were police officers, although she could not see writing on their vests. She said that she moved away from the window and that she heard a shot followed by "a couple of more shots." She went to the hallway when she heard the first shot. She said she went to the door after the shooting and was told by the police to get out of the doors and windows.

Jim Russell testified that he was the owner of Diamond Steel Corporation. He said the [petitioner] had been employed full-time as a welder from 1999 until 2002, at which time he was laid off due to economic

conditions in the industry. He said the [petitioner]'s working environment would have been "fairly noisy." He said the [petitioner] had participated in the company's 401K program.

The [petitioner] testified that he had lived in a home he owned on Chattering Lane for eight years before the events on trial occurred. He said that the residence had been home to himself, his wife, and his four children, but that he and his wife were separated on December 4 and that Calvin Williams was living at the home with him. He said that he had completed vocational training to be a welder and a tractor-trailer truck driver and that he had been employed for his adult life. He said that he was laid off his job as a welder at Diamond Steel in August or September 2002 and that he received unemployment benefits and withdrew money from his 401K account. He said that he had an active bankruptcy petition filed in December 2002 and that he had paid into the Chapter 13 plan. He acknowledged having used crack cocaine and marijuana but said he stopped in 1996 and was enrolled in a rehabilitation program for about seven months. He admitted he had used marijuana in 2000. He said he sold crack cocaine for a short period of time in 1996 and had a drug conviction from this time period. He admitted having "some personal weed" while living on Chattering Lane and said he probably sold some of it to friends who were visiting, but he denied selling drugs from the house.

The [petitioner] testified that his house had been burglarized twice, in 2000 and in 2002. He said that on December 3, 2002, the date of the second burglary, he and Calvin Williams left the house at 5:20 or 5:30 a.m. He did not know whether the house was locked because Williams was the last person out of the house. He said Williams did not have a key but could have locked the wood door by turning the handle from the inside. He said the iron door did not have a knob on the outside but had a deadbolt for which he had the only key. He said the iron door could be pried open or opened with a screwdriver if the deadbolt were not engaged. He said that he and Williams returned home an hour and a half to two hours later and that the front window and wood door were wide open and the iron door was closed. He said the iron door looked like it had been pried and the wood door was cracked at the doorknob. He said the latch on the wood door was on the floor in the front room and the door frame was "busted." He said the damage to the doorknob area of the wood door that was evident on the door, which was a trial exhibit, was the same as how it appeared after that morning. He said that a television was missing from the front room and that a television, cologne, a camcorder, watch, and a ring were

missing from the master bedroom. He said the master bedroom door had been pried open and the bed was "totally tore up." After calling his mother and eliminating his brother-in-law as a suspect, he called 9-1-1. When an officer arrived, he showed the officer the damage to the door and showed him the lock in the living room floor. He said that they went into the kitchen and that the officer filled out a report of the missing items but that he did not think the officer recorded everything he told him. He said he offered to show the officer the area in the back of the house where most of the damage had been done but the officer declined. He said he did not repair the doors that day and locked the iron door that evening. He said there was no reason to lock the wood door because it would not hold.

The [petitioner] testified that he owned a .357 weapon he purchased from a young man named John Upchurch for $100. He said he found out about the weapon when the young man's uncle went around asking people if they wanted to buy a gun. He admitted knowing he was not allowed to have a gun because of his prior drug conviction. He said that on December 4, he had .22, .38, .380, and .357 caliber ammunition at his house.

The [petitioner] testified that after dark on December 4, he was in the master bedroom after dinner and Williams told him that someone was at the door. He said "Rob" came in the house for two or three minutes and then left. He said that Rob was there because Rob owed him $50 and that he loaned money to other people despite the fact he was unemployed. He went back to his room for about thirty to forty minutes and watched television, and while he was in the bathroom, he heard a "huge" bang. He said he asked Williams what the noise was and that Williams told him someone was breaking into the house. He said Williams looked scared and was barely able to speak. He said that he was scared because he thought the burglars from the previous day had returned and that he ran to the dresser drawer and got a gun. He said he did not hear any other noises or commands after the bang. He said he went toward the end of the hallway and heard the iron door hit the air-conditioning unit, a sound with which he was familiar. He said he went to the end of the hallway, saw that the wood door had come open, and fired a shot at the door. He said he did not know who was behind the door and denied hearing the officers yelling they were with the Sheriff's Department and had a search warrant. He said that he heard a shot from outside and that he continued shooting at the door until he had emptied his gun. He said that while he was shooting, he saw a curtain fly open and determined that someone was firing through the window. He denied ever seeing the wood door come open. He said that after

he ran out of bullets, he was shot in the hand as he tried to look around a wall to see whether the wood door had come open. He said he dropped the gun, fell to the floor, and crawled to another room. He said he was trying to get to a cellular telephone to call the police. He said that as soon as he opened the door, shots came through the window. He said that he crawled into the room and that he may have bled on the curtains but that he never looked out the window. He said he heard a police scanner and realized the people outside were police. He denied that he would have shot had he realized the people were police officers.

The [petitioner] testified that he crawled to the end of the hallway and yelled, "I give up," and that he heard an officer tell him to show his face. He said he stuck his head behind a wall and saw a shotgun and handgun at the door. He said that they told him to lie flat on the floor against the wall with his hands on his head and that he complied. He said that Williams was lying on the floor in the living room and that Williams yelled, "I give up." He said that the police told Williams to come out first and that Williams was in the process of doing so when a dog came through the door and attacked Williams. He said that the dog and Williams wrestled until Williams was outside, that the officers took the dog off Williams immediately, and that a couple of the officers beat Williams. He said an officer told him to crawl to the door and that he was doing so when the dog came in and attacked him. He said he was too heavy for the dog to pull and that he pushed the dog out the door while the dog was "clamped on" him. He said he got halfway out of the house and was kicked by someone. He said that he kept yelling for them to get the dog off him but that the officers took their time in doing so. He said that he complied with the directive to lie flat on the ground and that an officer kicked him in the face and the bottom. He said that he was handcuffed and that an officer allowed the dog to attack him again. He said he was placed in a police car and had his head bumped in the process. He said that he was later removed from the police car and searched and that in the process, an officer hit him in his testicles with a fist and another officer hit him across his head with a pistol.

The [petitioner] testified that he was taken by ambulance to the hospital. He said that on the way, he asked the officers whether the officer whom he shot was okay and told them he did not know who they were and thought a robber had returned. He said he was unaware of any drugs in his house other than possibly some "roaches" that belonged to him. He denied that the 1.2 grams of marijuana other than the roaches was his but admitted that the scales in the closet were his. He said that he used the scales to "[w]eigh up some

weed" but that it had been two or three months since he had used them. He said the scales that were found in the car had been there for two or three months. He said the car belonged to his wife and had transmission problems. He said the cooking tubes had been in the storage area for two or three months.

The [petitioner] identified the refrigerator that was found in the attic and said he had stored it in the attic. He denied that it was plugged into the electricity.

A videotape of the scene was played during part of the [petitioner]'s direct examination. The [petitioner] identified various items and locations which were relevant to the events in question. He noted that the videotape depicted both the broken lock from the wood door and a glass of beer he was drinking when the incident began were sitting on his bedroom dresser.

On cross-examination, the [petitioner] acknowledged that there had been marijuana in a gallon bag that was in his bedroom but claimed it had all been smoked before December 4. He admitted that the drug paraphernalia with cocaine residue was his, but he denied he had used it since 1996. He acknowledged that there was stereo equipment, two televisions, a handgun, and a VCR which were not taken during the burglary. The [petitioner] admitted that he had locks on his bedroom door and closet door and that he was the only person with keys. He said he had locks on the doors to keep visiting relatives from stealing from him. He said the televisions that were in the living room and his bedroom on December 4 had been in his children's bedrooms before the burglary on December 3. He admitted that he was taking care of his wife's Rottweiler and that the dog would bark if strangers came to the house but said the dog ran loose and may have been elsewhere during the burglary. He denied that Williams ever told him not to shoot because the police were at the door. The [petitioner] said the police dog left bite marks on his arms but did not attack other parts of his body. He said he cut the bullet out of his hand with a razor and flushed it in a toilet while he was in jail.

The state recalled Detective Speight for rebuttal proof. Using the pick he had taken to the [petitioner]'s house on December 4, 2002, Detective Speight demonstrated the knock and announce procedure he followed that night.

After receiving the evidence, the jury found the [petitioner] guilty of first degree murder of George Selby and guilty of attempted first degree

-24-

murder of William Speight, Samuel Jones, Reginald Hubbard, Darren Feathers, Scott Chambers, and Robert Rivera. The jury found the [petitioner] not guilty of any offense in the counts alleging attempted first degree murder of George Stauffer, Roger Carpenter, Chauncey Walton, Phillip Barnett, and Richard Nelson.

The state and the [petitioner] entered into a sentencing agreement which called for the [petitioner] to serve a sentence of life without parole for the first degree murder conviction. After a sentencing hearing, he received twenty-year sentences for each of his five attempted first degree murder convictions. Consecutive sentencing was imposed, for an effective sentence of life without parole plus 100 years.

*State v. Reginald Rome*, No. W2006-00838-CCA-R3-CD, 2008 WL 2331018, *1-17 (Tenn. Crim. App., at Jackson, June 5, 2008).

In his appeal from his convictions and sentences, the petitioner argued (1) that the evidence is insufficient to convict him of first degree murder, (2) that the trial court erred in admitting the testimony of a nurse about a bullet recovered from the victim at the hospital, (3) that the trial court erred in allowing admission of insufficient evidence about the chain of custody of the bullet recovered at the hospital, (4) that the prosecution withheld information about a technical failure in videotaping the deposition of an unavailable witness, (5) that the trial court erred in ruling that the defendant could not introduce evidence from the deposition of a non-testifying state's expert and then call its own expert to refute that proof, and (6) that the trial court erred in its jury instructions.

*Id.* at *1. This court concluded that the petitioner waived his sixth assignment of error, that the trial court erred in its jury instructions, for failure to address the alleged error in his motion for new trial. *Id.* at *23. Finding no error in the sufficiency of the evidence or the trial court's rulings, the panel affirmed the judgments of the trial court. *Id.* at *19-22, 24.

On October 28, 2008, the petitioner filed a *pro se* petition for post-conviction relief. The post-conviction court appointed private counsel to represent the petitioner. Subsequently, the petitioner filed amended petitions on February 25, 2009, and May 13, 2009. The post-conviction court held an evidentiary hearing on August 13 and 14, 2009. The parties presented the following evidence at the hearing.

Both of the petitioner's trial counsel testified. Co-counsel testified that the petitioner retained lead counsel, and lead counsel brought him in to assist because the state was asking for the death penalty. Co-counsel said that the defense strategy was that the petitioner did not know that "it was [a] law enforcement agency that was kicking in his door[] when he fired those shots," and the petitioner believed that burglars who had recently broken into his home were returning. Co-counsel testified that a possible violation of the "knock and announce" rule when the police were executing the search warrant was significant because the petitioner's contention was that the police had already begun opening the door to his home when they announced that they were law enforcement. He said that the "knock and announce" issue was related to the petitioner's *mens rea* and not a Fourth Amendment argument.

Co-counsel further testified that the parties had a "contentious argument" over the jury instructions about the "knock and announce" rule. He characterized the state's requested instruction as "dealing more or less with the [officers'] state of mind and not the state of mind of [the petitioner]" because it "said that if the officers thought it was reasonable and had a search warrant then . . . there [was] a presumption that their knocking and entering was reasonable." Co-counsel said that the jury instructions outlined the extrinsic circumstances that would justify law enforcement's dispensing with the "knock and announce" rule. He said that, "in hindsight," the problem with the instructions was that "there [were] elements [there] that were never factually testified to at trial." As an example, he said that there was no testimony that the officers heard anything that would lead them to believe that someone inside the house was destroying evidence.

Co-counsel agreed that he did not argue in the motion for new trial that the jury instructions were erroneous. He testified, "I can say emphatically that there was no tactical decision not to argue it." He further testified that he was aware that the issue would be waived on appeal if not included in the motion for new trial. Co-counsel also said, "I know I argued it for sure." He said that he argued against the jury instructions, but that petitioner's argument against the instructions as presented in the post-conviction proceeding "[was] more of a nuance[d] argument that [he] just apparently didn't argue." Co-counsel said that he believed that the circumstances required some instruction on the "knock and announce" rule but "in hindsight, looking at the way it was addressed here, [he thought it] could [have been] problematic."

Co-counsel testified that lead counsel handled the appeal by himself because it was no longer a death penalty case. He discussed potential issues with lead counsel, but he did not see the appellate brief nor did he know that lead counsel discussed the jury instructions at length in the appellate brief.

On cross-examination, co-counsel testified that both the defense and the state submitted language for the jury instructions, and they "had a long, long discussion about jury instructions." He recalled that they presented witnesses who testified that they did not hear the officers announce that they were law enforcement before they began entering the house. He said that he did not know if he and lead counsel "made a tactical decision that the jury had to be advised regarding [the] search warrant issue" because "the [trial court], under the circumstances . . . and the argument that [the defense was] making[,] had to instruct the jury on the law as it related to that particular defense."

On re-direct examination, co-counsel agreed that, "in hindsight," it might have been a "wise move to include any questionable jury instructions in a motion for new trial simply to preserve the record[] and to have the ability to raise it on appeal[.]" He said that the discussion at trial about the jury instructions centered on the language the court would use, and he said that, while the defense took issue with the given instructions, "[he did not] know that [anyone] wouldn't look at [the defense's] request and look at what was actually given and say there's much of a [difference]." The post-conviction court entered a document titled "Defendant's Request for Jury Instructions" as exhibit seven, noting that neither the trial judge, the state, nor the defense signed the document.

The petitioner testified that co-counsel did not discuss the motion for new trial with him. He further testified that he and lead counsel discussed his appeal on one occasion, and lead counsel did not include any of the issues that he wanted in his appeal.

Lead counsel testified that the petitioner initially retained him when his case was in general sessions, but the court appointed him to represent the petitioner in criminal court. He recalled that the significance of the testimony regarding whether the sheriff's deputies knocked and announced their presence went to the credibility of witnesses and to the petitioner's "understanding of the circumstances." Lead counsel testified that he believed that he would have submitted a written proposal for jury instructions but could not recall specifically what he submitted. He recalled that the defense did not get the instructions that they wanted. Lead counsel testified that co-counsel prepared and argued the motion for new trial. He did not recall any specific discussions with co-counsel about including the jury instructions in the motion for new trial. Lead counsel said, "If [the jury instruction issue] was left out . . . then it was a mistake." He testified that he hired a legal research firm to assist him in preparing the appellate brief. He said that he was "[s]hocked" that the appellate court did not consider the jury instruction issue.

Following the close of proof, the post-conviction court took the matter under advisement. The post-conviction court filed a written order denying post-conviction relief on August 28, 2009. The court found that the petitioner failed to show that co-counsel

provided ineffective assistance by not including the jury instructions issue in the motion for new trial because he did not demonstrate that he suffered actual prejudice. The petitioner now appeals the denial of post-conviction relief.

**Analysis**

On appeal, the petitioner contends that the trial court erred by (1) not finding that co-counsel performed deficiently; (2) conducting an actual prejudice analysis rather than finding that co-counsel's deficient performance was presumptively prejudicial; and (3) not granting a delayed appeal or delayed filing of a motion for new trial.

In order for a petitioner to succeed on a post-conviction claim, the petitioner must prove the allegations set forth in his petition by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f). On appeal, this court is required to affirm the post-conviction court's findings unless the petitioner proves that the evidence preponderates against those findings. *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999). Our review of the post-conviction court's factual findings is *de novo* with a presumption that the findings are correct. *Fields v. State*, 40 S.W.3d 450, 457-58 (Tenn. 2001). Our review of the post-conviction court's legal conclusions and application of law to facts is *de novo* without a presumption of correctness. *Id.*

To establish ineffective assistance of counsel, the petitioner must show that (1) counsel's performance was deficient and (2) the deficient performance prejudiced the defense rendering the outcome unreliable or fundamentally unfair. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see also Arnold v. State*, 143 S.W.3d 784, 787 (Tenn. 2004). Deficient performance is shown if counsel's conduct fell below an objective standard of reasonableness under prevailing professional standards. *Strickland*, 466 U.S. at 688; *see also Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975) (establishing that representation should be within the range of competence demanded of attorneys in criminal cases). Prejudice is shown if, but for counsel's unprofessional errors, there is a reasonable probability that the outcome of the proceeding would have been different. *Strickland*, 466 U.S. at 694. If either element of ineffective assistance of counsel has not been established, a court need not address the other element. *Id.* at 697; *see also Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). Also, a fair assessment of counsel's performance "requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689; *see also Nichols v. State*, 90 S.W.3d 576, 587 (Tenn. 2002). The fact that a particular strategy or tactical decision failed does not by itself establish ineffective assistance of counsel. *Goad*, 938 S.W.2d at 369. However, deference is given to strategy

and tactical decisions only if the decisions are informed ones based upon adequate preparation. *Id.* (citations omitted).

The Post-Conviction Procedure Act provides that, once a court has found that counsel was ineffective on direct appeal, the court "shall vacate and set aside the judgment or order a delayed appeal." Tenn. Code Ann. § 40-30-111(a). Additionally, the act states:

(a) When the trial judge conducting a hearing pursuant to this part finds that the petitioner was denied the right to an appeal from the original conviction in violation of the Constitution of the United States or the Constitution of Tennessee and that there is an adequate record of the original trial proceeding available for a review, the judge can:

(1) If a transcript was filed, grant a delayed appeal;

(2) If, in the original proceedings, a motion for a new trial was filed and overruled but no transcript was filed, authorize the filing of the transcript in the convicting court; or

(3) If no motion for a new trial was filed in the original proceeding, authorize a motion to be made before the original trial court within thirty (30) days. The motion shall be disposed of by the original trial court as if the motion had been filed under authority of Rule 59 of the Rules of Civil Procedure.

*Id.* § 40-30-113.

*Deficiency.* The petitioner first argues that the post-conviction court erred by not finding that trial counsel's performance was deficient. The post-conviction court stated that it could not make a determination whether trial counsel made a tactical decision to not include the jury instructions issue in the motion for new trial because of co-counsel's "vague and confusing" testimony at the evidentiary hearing. Lead counsel testified that the omission of the issue was a mistake, but he said that co-counsel was in charge of the motion for new trial. Co-counsel testified that it was *not* a tactical decision, but then he spent considerable time explaining that the defense requested instructions about the "knock and announce" rule because they considered it central to their theory. Co-counsel said that he was not pleased with the language proposed by the trial court and argued against it. He repeatedly said that *in hindsight* he could have made a different argument or included it in the motion for new trial. However, a fair assessment of counsel's performance "requires that every effort be

made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689. Based on co-counsel's testimony, we cannot say that the petitioner provided clear and convincing evidence that trial counsel's performance was deficient. However, assuming *arguendo* that trial counsel's representation fell below professional standards, the petitioner has also not shown that trial counsel's allegedly unprofessional error was prejudicial.

*Prejudice*. The petitioner relies on *Wallace v. State*, 121 S.W.3d 652 (Tenn. 2003), to support his argument that (1) this court should deem trial counsel's failure to include the jury instructions issue in the motion for new trial to be deficient performance; (2) such deficient performance was presumptively prejudicial because it led to waiver of the issue on appeal; and (3) trial counsel's ineffective assistance entitled the petitioner to a delayed appeal. In *Wallace*, the Tennessee Supreme Court held that counsel's failure to file a motion for new trial, which resulted in the petitioner's waiving every issue other than sufficiency of the evidence for purposes of appellate review, was presumptively prejudicial deficient performance and entitled the petitioner to a delayed appeal. *Wallace*, 121 S.W.3d at 658. The court reasoned that the failure to file a motion for new trial was presumptively prejudicial and not subject to *Strickland*'s actual prejudice analysis because "[a]s a direct result of counsel's ineffective assistance, the defendant was procedurally barred from pursuing issues on appeal, and the State's case was not subjected to adversarial scrutiny upon appeal." *Id.* at 660. However, the court also noted that the United States Supreme Court ruled that the Tennessee Court of Criminal Appeals correctly applied the *Strickland* actual prejudice analysis when trial counsel's errors were "sporadic in nature, rather than complete." *Id.* (citing *Bell v. Cone*, 535 U.S. 685, 697-98 (2002)).

In this case, we cannot conclude that trial counsel's failure to include the jury instructions issue in the motion for new trial was an abandonment of his client at a critical stage in the judicial process resulting in "complete failure to subject the State to the adversarial appellate process." *See id.* at 658. Co-counsel prepared and argued a motion for new trial, and lead counsel pursued an appeal that included four issues, which this court considered on the merits, other than sufficiency of the evidence and the waived jury instructions issues. We conclude that the petitioner's allegation that he received ineffective assistance of counsel is subject to *Strickland*'s actual prejudice analysis. Therefore, the post-conviction court did not apply an incorrect standard in its analysis below, and the petitioner's argument to the contrary is without merit.

The post-conviction court found that the petitioner did not suffer actual prejudice as a result of trial counsel's failure to include the jury instructions issue in the motion for new trial because "the instructions in this case fairly informed the jury as to the *mens rea* required

to support the conviction and did not mislead the jury on this point," and we agree. Under the United States and Tennessee Constitutions, a defendant has a right to a correct and complete charge of the law, so that each issue of fact raised by the evidence will be submitted to the jury on proper instructions. *State v. Garrison*, 40 S.W.3d 426, 432 (Tenn. 2000). When the trial court's instructions to the jury correctly, fully, and fairly state the applicable law, it is not error to refuse to give a special requested instruction. *State v. Inlow*, 52 S.W.3d 101, 107 (Tenn. Crim. App. 2000); *State v. Forbes*, 918 S.W.2d 431, 447 (Tenn. Crim. App. 1995). This court must review the entire jury charge; we can find error only if, when read as a whole, the charge fails to fairly submit the legal issues or misleads the jury as to the applicable law. *State v. Phipps*, 883 S.W.2d 138, 142 (Tenn. Crim. App. 1994). As a mixed question of law and fact, our standard of review for questions concerning the propriety of jury instructions is *de novo* with no presumption of correctness. *State v. Smiley*, 38 S.W.3d 521, 524 (Tenn. 2001).

This court, on direct appeal, characterized the petitioner's argument regarding the jury instructions as follows.

> The [petitioner] claims that the jury instructions were misleading. He argues that the instructions were flawed because they caused the jury to ignore the question of *mens rea* and to believe conviction was required even if it did not accept inconsistencies and ambiguities in the prosecution's evidence. The instructions in question read:

>> Members of the jury, if you find from the proof that the officers had a search warrant, you may infer that the officers were under a legal duty to conduct the search. If the defendant knows that the search is being made by law-enforcement officers, respect for the rule of law requires that the defendant submit to the apparent authority.

>> The law requires that a serving officer wait a reasonable period of time after announcing before entering.

>> The types of considerations that the law allows an officer to take into account for determining the existence of a reasonable period of time include considerations such as:

>> Whether the officers have a justified belief someone within the dwelling is in immediate peril of bodily harm.

Whether the officers have a justified belief those inside of the dwelling are aware of their presence and are engaged in escape or the destruction of evidence.

Whether a person inside the dwelling is armed and is either likely to use the weapon or become violent.

Or whether the person inside the dwelling has threatened the officer's safety, possesses a criminal record reflecting violent tendencies or has a verified reputation of a violent nature.

Whether or not any of these factors exist in this case, and if so, what impact they may have had on determining what constituted a reasonable period of time in this case are factual matters for the jury to determine.

Although the [petitioner] states that the first paragraph regarding the [petitioner]'s knowledge was proper, he contends that the remainder of the instructions were erroneously given because it misled the jury into believing that if the attempted search entry was properly executed, this fact was relevant in determining the [petitioner]'s guilt. He argues that his state of mind, not that of the officers, was relevant. He also argues that these instructions confused the jury, as evidenced by their verdicts convicting the [petitioner] of the first degree murder and some of the attempted first degree murder counts but acquitting him of other attempted first degree murder counts.

*Rome*, 2008 WL 2331018, at *23.

In Tennessee, "[u]nder [the 'knock and announce'] rule, 'a law enforcement officer who is charged with the execution of a search warrant must give: (1) notice of his authority; and (2) the purpose of his presence at the structure to be searched.'" *State v. Majors*, 318 S.W.3d 850, 858 (Tenn. 2010) (citing *State v. Perry*, 178 S.W.3d 739, 745 (Tenn. Crim. App. 2005)). Regarding exceptions to the "knock and announce" rule, a panel of this court explained:

As a general rule, it is sufficient for the state to show that (a) a person within the dwelling knows of the officer's authority and purpose; (b) the officers have a justified belief someone within the dwelling is in immediate

-32-

peril of bodily harm; (c) the officers have a justified belief those inside the dwelling are aware of their presence and are engaged in escape or the destruction of evidence; (d) a person inside the dwelling is armed and is either likely to use the weapon or become violent; or (e) a person inside the dwelling has threatened an officer's safety, possesses a criminal record reflecting violent tendencies, or has a verified reputation of a violent nature.

*State v. Curtis*, 964 S.W.2d 604, 610 (Tenn. Crim. App. 1997).

Clearly, the trial court used the language from *Curtis* when creating the jury instructions. In our view, the jury charge fairly stated the "knock and announce" rule and appropriately addressed the petitioner's *mens rea* without being misleading. In light of our conclusion and the entirety of the opinion on direct appeal, we cannot say that there is a reasonable probability that the petitioner would have been successful on appeal, but for co-counsel's allegedly unprofessional error. We conclude that the petitioner has not shown that he received ineffective assistance of counsel. We further conclude that the petitioner is not entitled to a delayed motion for new trial or delayed appeal because he was not "denied the right to an appeal from the original conviction in violation of the Constitution of the United States or the Constitution of Tennessee." *See* Tenn. Code Ann § 40-30-113(a). Therefore, the petitioner is without relief in this matter.

## Conclusion

Based on the foregoing reasons, we affirm the denial of post-conviction relief.

_____
J.C. McLIN, JUDGE

-33-